# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 11, 2003

## STATE OF TENNESSEE v. WILLIAM RAMSEY

### Direct Appeal from the Circuit Court for Warren County
### No. F-8152    Charles D. Haston, Judge

---

### No. M2001-02735-CCA-R3-CD - Filed July 15, 2003

---

The defendant was convicted by a Warren County Circuit Court jury of one count of aggravated robbery, a Class B felony, and one count of theft over $1000, a Class D felony, based on his participation in separate criminal acts that occurred over four months apart. The trial court sentenced him as a Range I, standard offender to nine years for the aggravated robbery conviction and three years for the theft conviction, with the sentences to be served concurrently, for an effective sentence of nine years in the Department of Correction. In this appeal as of right, the defendant argues that the trial court erred in denying his motion to sever the offenses; in refusing to find him indigent and denying his request for funds to hire an expert witness; and in enhancing his sentences from the presumptive minimum in the range. Following our review, we conclude the trial court did not err in denying the defendant's motion for severance; the trial court erroneously based its refusal to declare the defendant indigent, in part, on the defendant's mother's financial resources, but there was no error in the trial court's denial of the defendant's request for funds for an expert witness; and the defendant's theft sentence should be modified. Accordingly, we affirm the judgments of the trial court, but reduce the defendant's sentence for theft over $1000 from three years to two years, to be served concurrently to his nine-year sentence for aggravated robbery.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed as Modified

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

George A. Burke, Sr., Spencer, Tennessee (on appeal); and Billy K. Tollison, McMinnville, Tennessee (at trial), for the appellant, William Ramsey.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Clement Dale Potter, District Attorney General; and Thomas J. Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On April 14, 2000, a Warren County Grand Jury returned a three-count indictment against the defendant, William Ramsey, and several codefendants, charging him with aggravated robbery, theft of property over $1000, and vandalism over $1000, based on his participation in two separate events: a September 1999 theft and vandalism of a vehicle owned by Connie Cravens' mother-in-law, which was used by Connie Cravens and her husband, Roy Cravens, and a January 2000 aggravated robbery of Connie Cravens. The State subsequently dropped the vandalism count, and, on May 9, 2001, the defendant was tried alone before a Warren County Circuit Court jury on the two remaining counts of the indictment, the trial court having denied his motion for severance of the offenses, and two of his codefendants having previously received separate trials.

At this point, we believe it will be helpful if we give a brief overview of the various parties involved in this case and their relationships to one another. The defendant's two codefendants in the theft and vandalism counts of the indictment were Angela Cravens and Freddie Myers. In September 1999, the defendant was dating Angela Cravens and living with her in her home, where Myers, who was a friend of the defendant's, was a frequent weekend guest. Prior to her relationship with the defendant, Angela had been married to Roy Cravens, who subsequently married Connie Cravens, the victim of the aggravated robbery. Thus, the actual owner of the Chevrolet Geo Tracker, Freddie Cravens, was Roy Cravens' mother, Connie Cravens' mother-in-law, and Angela Cravens' ex-mother-in-law. The defendant's two codefendants in the January 2000 aggravated robbery were Myers and Myers' friend from Pennsylvania, a man named Rongie Taylor.

### Trial

The State's first witness was Angela Cravens. She said she had not yet been tried, but had not been promised anything in exchange for her testimony against the defendant. Her further testimony was as follows: Roy Cravens was her ex-husband, whom she had divorced in July of 1999. She met the defendant after her separation from Roy,[1] and the defendant lived with her from September to December 1999. Sometime after her divorce, she began to suspect Roy of having molested her stepsister during their marriage, and she discussed her suspicions with the defendant. She, the defendant, and the defendant's friend, Freddie Myers, who frequently visited on weekends, were discussing the situation one night in September 1999 when they came up with the idea of retaliating against Roy by stealing the Geo Tracker, a vehicle Roy's mother had bought for him during his marriage with Angela, and to which Angela still had a set of keys. Angela gave the keys to Myers, dropped him and the defendant off at Roy and Connie's house, and then drove to a church to wait. Approximately thirty minutes to an hour later, the defendant and Myers met her at the church in the Tracker. She, the defendant, and Myers then drove back to her home in Viola, where

---

[1] Because four of the parties involved share the last name "Cravens," we have elected at times to use only the individuals' first names for simplicity's sake. We intend no disrespect by such usage.

-2-

Myers and the defendant removed the Tracker's stereo and "tore the vehicle up a little bit." Afterwards, Angela and the defendant, traveling in Angela's vehicle, accompanied Myers, who drove the Tracker, to a spot in Grundy County, where the defendant and Myers spray painted the vehicle and burned it.

Angela further testified that Myers telephoned one evening in late January 2000 while the defendant was at her home, and she overheard the defendant say something to him "about Phase 2." At that point, she took the telephone away from the defendant and told Myers that she did not want him to do anything else to her ex-husband and wanted them to stop. The defendant left in his van late that night, and she did not see him again until his trial.

Roy Cravens' mother, Freddie Cravens, testified that she and her daughter-in-law, Connie, met with the defendant and his mother at a restaurant in McMinnville in March 2000, after he had been charged in the theft of the Geo Tracker and in the aggravated robbery of Connie.[2] The defendant "[m]ore or less apologized" to Connie for the robbery, and admitted his involvement in the theft of the Tracker. He informed them of the location of some of their property that had been taken and offered to let them have his van. They told him they did not want his van, and he and his mother then offered to pay for their vehicle. As for his motivation, the defendant told them he had been involved with Angela, and Angela had "done it to get back at [the witness's] son." He said nothing about having acted out of fear of Myers.

Connie Cravens testified that her mother-in-law, who lived next door, telephoned her on the morning of September 26, 1999, to report that her Geo Tracker, which she let Connie and Roy use, was missing from their home. Taken with the Tracker was some personal property that had been in the vehicle, including Roy's "Marine K-Bar knife." The witness said she was home alone on January 31, 2000, and had let her dog outside, when she saw the defendant standing on her front porch. He said he was lost and needed directions, and she closed the door and went to get her atlas. When she returned, the defendant was standing in her living room beside her television. She was showing him the atlas and attempting to explain the directions when Myers walked into the house. During the approximately ten minutes she spent alone in the house with the defendant before Myers' arrival, the defendant never warned her that Myers was outside or that she was in danger.

Myers first whispered with the defendant and then pulled out her husband's knife and asked if she recognized it. She told him she did, and that she knew where he had gotten it. Myers next pushed up his sleeve to show her a roll of duct tape he wore around his arm like a bracelet, and told her if she would not scream he would not use it on her. She agreed and he handcuffed her and made her sit in a kitchen chair placed in the living room. The defendant and Myers showed her a set of keys to her house which they said they had obtained from Angela, and said they were not there to hurt her but instead to give a message to her husband, with Myers then informing her that their reason for being there was because her husband had engaged in an inappropriate relationship with Angela's sister. Next, Myers sent the defendant to search her bedroom for a gun safe, while he

---

[2]Connie Cravens later testified that Roy Cravens and his father were present at this meeting as well.

looked through the living room. The defendant returned saying he could not find the safe, and Myers then went into the bedroom to look, while the defendant "made himself at home" on the couch, saying that he was an "I.R.C. cop"[3] and had discovered that Roy was visiting inappropriate chat rooms on the Internet.

The witness testified that Myers returned from her bedroom with a shotgun and directed the defendant to take their computer. She said the defendant wrote down the serial numbers for the computer and monitor, telling her it would be easier for her to retrieve the computer after they pawned it if she had the serial numbers. Myers was present at the time, and both men were apologetic about taking the items. While the defendant made two separate trips to carry items out to their van, Myers sat and talked to her. Before departing, Myers removed the batteries from her cordless telephone and took the cord from her other telephone. At Myers' instruction, the defendant retrieved four dollars from the van and gave it to her as payment for a replacement telephone cord. The witness testified that Myers placed the knife on a bookshelf after she was handcuffed, she did not see him do anything to intimidate or threaten the defendant, and the defendant did not appear to be afraid of him. She said that, at one point during the robbery, Myers picked the knife up from the bookshelf, looked at her, and asked what she thought he should do to her, which she interpreted as a threat and which made her believe she would be killed. On cross-examination, she agreed that the defendant did not handle the knife and that Myers appeared to have been making all of the decisions.

Officer Kenny Prater of the Manchester Police Department, formerly an investigator with the Warren County Sheriff's Department, testified he investigated the September 1999 theft of the Cravens' vehicle, but was unable to develop any leads on the crime. He also participated in the investigation of the January 2000 robbery, which resulted in the defendant's mother contacting the sheriff's department and making arrangements to accompany the defendant to the department for an interview. During that February 1, 2000, interview, the defendant signed a written waiver of his rights and gave two statements admitting his involvement in both crimes. The statements, which were reduced to writing and signed by the defendant, were read aloud by Officer Prater at trial and admitted as exhibits to his testimony. The theft statement reads as follows:

> I used to date Angie Cravens on a regular basis. She had told me and Freddy Myers about her ex-husband Roy Cravens molesting her sister.
>
> During one conversation Angie had told us that she would like to get even. Freddy was thinking of ways to get even. We decide[d] to get the Tracker that Roy drove. Angie and Freddy and I went to w[h]ere Roy lived and Angie showed us. Angie had a key to the Tracker and gave it to Freddy. Angie and I dropped Freddy off and we waited at a church. About an hour later Freddy drove up with the Tracker. We took back rodes [sic] back to Viola. Freddy had

---

[3] The defendant testified on cross-examination that "an I.R.C." is "[a]n Internet Relay Chat Operator."

-4-

followed us to Grundy County. We parked at a vacant lot and burned the Tracker. Freddy had taken a knife and a service phone before burning the Tracker. We all sprayed [sic] painted the Tracker before we burned it.

In his separate statement detailing his participation in the aggravated robbery, the defendant said Myers telephoned him at Angela Cravens' house wanting to talk to him, but did not want to talk over the phone. The defendant learned that Myers was at the defendant's uncle's house in Knoxville and agreed to meet him there. He also stated that Angela told him that either Myers or someone else had said something to her about phase two or part two, and that Angela told him (the defendant) that she did not want them to do anything else to her ex-husband. The defendant further stated that he drove to Knoxville, met Myers, and drove him back to McMinnville, where they first had breakfast at a Waffle Shop and then went to a convenience store. When Myers returned from the store, he insisted on driving the defendant's van, and the defendant reluctantly allowed him to do so. The defendant's statement continued as follows:

> He [Myers] left on 70 S Bypass and started going to Angie's ex-husband's house. When we got to the store before [the] house, he pulled in and parked. He told me you know what we got to do. He explained to me that he wanted to go to Angie [sic] ex-husband [sic] house and get some stuff and leave. Angie had told us one time that her ex-husband had a federal firearms license and had some guns. Angie even showed us where he lived.

> We pulled into the store. Planned everything out. Freddy wanted me to go to the house and ask for direction [sic] and use the phone and he would come in behind me. When we pulled up to the house I got out and asked the lady for direction [sic]. I asked to use the phone. I acted like I was dialing some number. Freddy walked in. He wanted me to mace her but I wouldn't. I acted as if I was looking in the atlas.

> Freddy finally told the lady tha[t] we wasn't here to get directions. Freddy pulled the knife that he had and asked her if she reco[g]nized it. The lady told us yes. Freddy told the lady that we wasn't there to hurt her but for our saftey [sic] put these handcuffs on. The lady put them on herself.

> We put her in a chair because we thought they be [sic] guns laying [sic] around the couch. Freddy began telling the lady about Roy being a child molester.

> Freddy told me to get Roy['s] computor [sic] and asked which one it was. The lady told me and I went and got it and brought to the living room. Freddy had asked her about the gun cabinet and the lady told him they [sic] wasn't one and Freddy went to look anyway.
>
> Freddy had found a shot gun [sic] and told me to put the computor [sic] in the van. I went back in and Freddy told me to take the phone line from the phone. I had also had written down the serial numbers to the computor [sic] and left it for her. Freddy told me to go and wait in the van. I went and got $4.00 dollars and gave it to her for the phone line.
>
> I went to the van and waited on Freddy for about ten minutes. Finally he came out and we left. He had the shot gun [sic] when we left. We went back to Knoxville to my uncle's house.

The defendant made the following addition to his robbery statement:

> I felt intimidated around Freddy. Im [sic] scared of him.
>
> Im [sic] sorry for what I have done. I know it was wrong.
>
> There was also a black male with us. I don't know his real name only Rongy. He's about mid 40. He is a friend of Freddy's from Pennsylvania.

Officer Prater acknowledged the defendant voluntarily came in to give his statements before officers had focused on him as a suspect and before any warrants had been issued for his arrest.

Testifying in his own defense, the defendant claimed that the idea to steal the Geo Tracker had been Angela's, and that he had remained with her at the church while Myers committed the theft. He admitted participating in the vandalism of the vehicle, but denied having been involved in the theft of any items from it. He claimed that his participation in the January robbery was forced by Myers, who threatened his life. The defendant said he was afraid of Myers and had always been intimidated by him, explaining that Myers had beaten him up in the past, taken his money, and once left him stranded at an Ohio rest area.

The defendant testified Myers telephoned him at Angela's house on January 30 to tell him that he was at the defendant's uncle's house in Knoxville and would not leave until the defendant arrived. Although Myers refused to tell him what he wanted, the defendant agreed to go because he feared Myers would vandalize his uncle's house. When he arrived, Myers wanted to know where his backpack was and told the defendant that something bad would happen to him if he did not find it. After the defendant suggested that the backpack might be at Angela's house, he drove Myers and

Rongie Taylor to McMinnville, where they stopped at a service station so that Myers could buy some drinks.  When Myers returned to the vehicle, he held the knife he used in the robbery against the defendant's side and threatened to kill him if he did not participate with them in the robbery at the Cravens' home.

According to the defendant's account, he was alone with Connie Cravens inside her house for only one minute before Myers followed him inside.  Myers wanted him to "mace" Connie, but he refused because he did not want to hurt anyone.  The defendant explained his failure to flee or seek help during the robbery by stating that Taylor remained outside in possession of the keys to his van, and he also feared that Myers, who knew where his mother lived in Nashville and the location of his uncle's residence in Knoxville, would retaliate against him or his family.  He testified Myers forced him to take him and Taylor back to his uncle's house in Knoxville after the robbery, held a knife against his side when a family friend came to the door, and then held him on the living room floor at gunpoint when police officers came knocking at the door.  Later that same day, Myers forced the defendant to drive him to Morristown, followed by Taylor, who drove his own vehicle. After dropping Myers off, the defendant drove directly to a friend's house to telephone his mother, who in turn contacted law enforcement officers.

On cross-examination, the defendant testified he had known Myers for approximately two years when the events occurred.  He acknowledged Myers was a regular visitor to Angela's home, that he and Myers were dressed in similar clothing during the robbery, and that a police officer had found him and Myers stopped in his vehicle in the vicinity of the Cravens' home in December 1999. The defendant denied, however, that he had been conducting surveillance on the home in order to learn the family's schedule and habits, or that he had dressed like Myers as part of a "uniform" to commit the robbery.  He said he had not called the Knoxville police when Myers telephoned him from his uncle's house in Knoxville because he feared Myers would vandalize the house before the police arrived.

Shirley Warren, a friend of the defendant's family, testified she went to check on the defendant at the Knoxville residence on January 30 or 31 at his mother's request. When the defendant finally answered the door, she saw Myers standing beside him and the flash of a small knife he was holding against the defendant's side.  The defendant told her, "Go home, [M]om.  Go home," so she returned to her home, telephoned the defendant's mother, and informed her of what she had witnessed.  Warren testified she did not telephone the police because the defendant's mother told her that she had already contacted the police and intended to call them again.

The defendant's mother, Elizabeth Daughtery, testified that she held a power of attorney for her son, who was almost twenty years old when the robbery occurred.  She said he telephoned her in a distraught state on the evening of the robbery, asking for help and, although she now realized she should have told him to go to the Knoxville Police Department, she had thought at the time that if he went to the Warren County authorities and told how he had been forced to participate against his will "they would investigate it and justice would have been done."  Daughtery testified she had

filed police reports in the past on Myers, in both Davidson County and in Ohio, but nothing had resulted from them. She said she was afraid of Myers.

**Sentencing Hearing**

Five witnesses testified at the defendant's June 8, 2001, sentencing hearing: Marty McGinnis, an investigator with the Warren County Sheriff's Department; Donna Dunlap, the Tennessee Department of Probation and Parole officer who prepared the defendant's presentence report; Connie Cravens; Elizabeth Daughtery; and the defendant. Investigator McGinnis testified he learned during his investigation of the robbery that a white van matching the description of the vehicle used in the crime had been seen in the vicinity of the Cravens' home approximately thirty days before the robbery occurred. Based on that information, he obtained the defendant's name. Subsequently, he spoke by telephone with the defendant's mother and asked for her help in trying to get the defendant to come to the department for an interview. Investigator McGinnis said he initiated the contact with the defendant's mother and had no memory of her having first called him to leave her telephone number. He acknowledged, however, that he could not be certain she had not first spoken with someone else in his department. He further acknowledged that the defendant voluntarily confessed, was cooperative with the officers, and assisted in the recovery of some items.

Donna Dunlap testified that the defendant failed to return the first questionnaire she sent him in the mail and seemed uninterested, wanting his mother to answer the questions, when she later saw him in court and gave him another questionnaire to complete. The defendant failed to express any remorse for his actions and, in the version of the incidents he provided for the presentence report, maintained his innocence of the crimes. He reported smoking marijuana twice in the past and a prior arrest in March 1999 in Davidson County for assaulting his mother, for which the charge had been dismissed. The defendant indicated he had a lengthy history of psychological and psychiatric treatment, and she was able to confirm he was receiving disability benefits based on his psychiatric problems. On cross-examination, Dunlap acknowledged she did not witness the defendant fill out the questionnaire and the defendant's mother told her she held a power of attorney for the defendant. Dunlap also acknowledged that she never directly asked the defendant if he was remorseful.

Connie Cravens testified she was scared for her life, believing that she was going to die, during the course of the robbery. She agreed that the defendant distracted her while Myers entered the home and that he assisted Myers by removing items from her home. She acknowledged she never saw the defendant with a weapon, that he never threatened to hurt her, and that he later assisted her family in trying to recover some of their property.

The defendant's mother, Elizabeth Daughtery, was adamant that she initiated the contact with the Warren County Sheriff's Department at the request of the defendant, who was "scared to death" after the robbery and wanted to talk to the police. She testified that the defendant assisted the authorities by revealing the location of some of the stolen items and by telling the police where Myers could be found. She said the defendant had been committed to a mental institution at the time the first questionnaire was mailed, and she had filled out the second questionnaire for him, because

he did not understand all of the questions. According to her testimony, the defendant had only a fourth or fifth grade education and operated at the level of a ten- or eleven-year-old, had been in special education classes since the first grade and on medications since the age of five, was diagnosed with bipolar disorder, and frequently exhibited poor judgment, especially when he quit taking his medications, as had been the case at the time the events at issue in this case occurred. She said the defendant had tried to commit suicide three or four times and had been institutionalized about five times in the past year and a half. He was required to take his medications four times a day, but the jail administered medicine only twice daily and failed to give it to him with food or milk, as required. Ms. Daughtery testified that the defendant was not a threat and stayed out of trouble when he was on his medications, and requested that the trial court sentence him to probation with a mandatory order of treatment, "where he could be tested on probation each week or every two weeks to make sure that he is still taking his medications."

The defendant testified he was off his medications at the time the crimes occurred, and said he was sorry he had "hung around with the wrong crowd at the wrong time." He maintained he had been under duress during the robbery. He conceded, however, that he had not been under duress at the time he stole the vehicle.

## ANALYSIS

### I. Severance of Offenses

The defendant first contends that the trial court erred by denying his motion to sever the offenses. He argues there was insufficient evidence that the separate incidents were part of a common scheme or plan and asserts that his claim of having acted under duress during the armed robbery was severely undermined, thereby prejudicing his defense, by the introduction of evidence of his participation in the earlier theft and vandalism of the Geo Tracker. The State argues that the trial court properly concluded that the offenses were part of a continuing plan or conspiracy to retaliate against Angela Cravens' ex-husband. The State further argues that even if the trial court erred in refusing to sever the offenses, the error was harmless because the proof of both offenses "far exceeds the reasonable doubt standard required to convict."

The defendant moved to sever the offenses pursuant to Rule 14 (b)(1) of the Tennessee Rules of Criminal Procedure. A trial court's "decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). Rule 14(b)(1) provides that if offenses have been consolidated pursuant to Rule 8(b), which allows for the permissive joinder of offenses deemed part of a common scheme or plan or of the same or similar character, "the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan *and* the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1) (emphasis added). "[A] trial court's refusal to sever offenses will be reversed only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Shirley, 6 S.W.3d at 247 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

The primary issue in determining whether offenses should be severed "is whether evidence of one offense would be admissible in the trial of the other if the two offenses remained severed." Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000) (citing State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984)). Before denying a motion to sever offenses, the trial court should conclude that: (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one offense is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect caused by the admission of the evidence. Id. When determining whether a trial court abused its discretion in denying a motion to sever, the reviewing court should ordinarily look only at the evidence and arguments presented at the hearing on the motion to sever. Id.

At the motion hearing, the State cited the reference overheard by Angela about "beginning phase two," and Myers' statements to Connie about their motivation for the robbery as evidence that the offenses were part of a common plan or scheme to retaliate against Roy Cravens for his alleged abuse of Angela's stepsister. The State additionally contended that evidence of one crime would be admissible at the trial of the other, asserting that Myers and the codefendant had learned of the location of the Cravens' residence during the theft of the Tracker and arguing that Myers' use during the robbery of the knife taken from the Tracker tied the two offenses together. The trial court agreed, ruling that the State had shown "there is a common thread, common plan, common undertaking from one event to the other" sufficient to justify overruling the defendant's motion for severance.

We find no abuse of discretion by the trial court in this ruling. There are three categories of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to be considered "signature crimes"; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. Shirley, 6 S.W.3d at 248 (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3d ed. 1995)). The trial court found that the theft and robbery were part of a continuing plan or conspiracy to retaliate against Roy Cravens for his alleged abuse of Angela's stepsister. This court has described what is required to support a finding that separate offenses are part of a continuing plan or conspiracy:

> The second category, "continuing plan or conspiracy," involves not the similarity between the crimes, but the common goal or purpose at which they are directed. N. Cohen, Tennessee Law of Evidence, § 404.11 (2nd ed. 1990). In such circumstance, the proof sought is of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial. Id. (citing Wigmore on Evidence 249 (Chadbourn rev. 1979)). E.g., State v. Brown, 823 S.W.2d 576, 585 (Tenn. Crim. App. 1991).

State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer v. State, 12 S.W.3d 438 (Tenn. 2000). Here, there was substantial evidence that both the theft and vandalism of the vehicle and the aggravated robbery of Connie Cravens were committed for the same purpose of retaliating against Roy Cravens. The theft and vandalism of the vehicle occurred as the

result of a plan hatched by Angela, Myers, and the defendant to punish Roy for his alleged abuse of Angela's stepsister. On the night before the aggravated robbery occurred, Angela heard the defendant and Myers discussing beginning "phase two" of the plan, which she understood to be a continuation of their retaliation against her ex-husband. Myers and the defendant used a knife they had taken from the stolen Tracker, which Connie Cravens recognized as belonging to her husband, to commit the aggravated robbery. In addition, Myers informed Connie that their reason for committing the robbery was to send a message to her husband, who had engaged in an inappropriate relationship with Angela's sister. Thus, there was ample evidence to show that these offenses were part of a common plan or scheme.

Furthermore, evidence of the defendant's theft of the vehicle would have been admissible in his trial for aggravated robbery had the offenses been tried separately. Tennessee Rule of Evidence 404(b) generally bars evidence that an accused has committed some other crime or bad act independent of that for which he is on trial. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S. Ct. 1339, 127 L. Ed. 2d 687 (1994). However, evidence of another crime may be admissible if it is relevant to some matter actually at issue in the case on trial, such as the defendant's motive, identity, intent, the absence of mistake, opportunity, or as part of a common scheme or plan, and if its probative value is not outweighed by the danger of an unfair prejudicial effect. See Bunch v. State, 605 S.W.2d 227, 229-30 (Tenn. 1980). In this case, the defendant's and Myers' theft of the Tracker, in which they stole the knife which they later used to commit the aggravated robbery, would have been admissible not only to show their intent in committing the aggravated robbery, but also to show that the aggravated robbery was part of their continuing plan or conspiracy to retaliate against Roy Cravens. Under these circumstances, the trial court properly denied the defendant's motion to sever the offenses.

Additionally, we conclude that even if the trial court erred, as the defendant argues, in denying the motion to sever, the error was harmless. Tenn. R. Crim. P. 52(a). In most severance cases, "the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict, beyond a reasonable doubt." Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979); see also Spicer, 12 S.W.3d at 447; Shirley, 6 S.W.3d at 250. Here, the evidence of the defendant's guilt in each case was overwhelming. In addition to the testimony of Angela and Connie Cravens that tied the defendant to the theft and the robbery, respectively, the defendant issued detailed confessions to each crime. He also admitted and apologized for his involvement in both crimes to Freddie Cravens and Connie Cravens. The defendant's claim of having acted under duress during the robbery was refuted by substantial evidence, including Connie Cravens' testimony that he did not appear to be intimidated by Myers and failed to warn her of the danger from Myers during the ten minutes he spent alone with her before Myers' arrival, and Angela Cravens' testimony that Myers was a friend of the defendant's and regularly visited in the home she and the defendant shared. In the face of such overwhelming evidence of the defendant's guilt, we conclude that any error of the trial court, in denying the motion to sever the offenses, would have been harmless.

## II. Denial of Defendant's Motion for Funds for Expert Services

The defendant next contends that the trial court erred by failing to declare him indigent and denying his request for funds to pay for his expert witness's trial testimony. For a complete understanding of this issue, it is necessary for us to set out the various motions the defendant presented at the pretrial motion hearing. At the time of the hearing, the defendant was out on a $25,000 bond, which his mother had financed by executing a deed of trust on her home to the Warren County Circuit Court Clerk. In a series of motions presented to the trial court, defense counsel requested the following: that the trial court release the defendant's mother from the property bond, thereby freeing her house to be used as collateral for a loan to pay for the services of an expert witness; that, in the event the defendant were returned to State custody, the trial court order the jail to administer his medication for his bipolar disorder four times per day as prescribed rather than twice daily, as was the jail's practice; that, if the jail were unable to administer the medication four times per day, the trial court release the defendant on his own recognizance so that he could receive his proper medication; and finally, that the State pay the $1000 fee required by the defendant's expert witness, thereby eliminating any need for his mother to come off the property bond and ensuring that the defendant could remain at home to receive his proper medication.

With respect to the expert witness, defense counsel informed the trial court that he would testify regarding the defendant's mental ability, that the defendant's mental ability was relevant to his defense, and that his defense was based not on insanity or diminished capacity but on duress. In response, the State argued that the defendant's subjective mental state was irrelevant to the statutory defense of duress and, should the defendant seek to call an expert witness at trial, the State would file a motion to bar his testimony. At the conclusion of the hearing, the trial court ruled that the defendant was not indigent and therefore was not entitled to State funds to pay for his expert witness. Because of that determination, the trial court did not reach the issue of whether the testimony of the expert witness would be admissible at trial, although it did make a brief statement in passing that it was "all for letting" the defendant use his expert if he had one and could afford him. The defendant now argues that the trial court erred in finding he was not indigent and in refusing to grant him funds to pay for his expert witness.

We first address the defendant's claim that the trial court erred in refusing to declare him indigent. In support of the motion for indigency, defense counsel presented the testimony of the defendant's mother, who said the defendant was disabled and received only $505 monthly from social security, which stopped when he was incarcerated. She testified she was currently "broke," having expended a total of approximately $12,000 in legal fees, which included the cost of retaining defense counsel, and was therefore unable to pay the $1000 required by the defendant's expert witness. On cross-examination, she acknowledged that the defendant lived with her and had no living expenses; that he had owned a vehicle worth approximately $1300, which he had since totaled; and that he had worked at "Calsonic" or "CYC" for about a week and a half and at Toys-R-Us for three weeks, but had been fired. In response to a question by the trial court, she testified that she was not indigent, but she was unable to pay for the services of the expert witness because her

savings had been exhausted and she had been forced to take out a second mortgage on her home. She said her son was indigent.

In refusing the defendant's request to be declared indigent, the trial court noted, among other things, that the defendant's mother had managed to pay over $12,000 towards his defense and that the defendant had had a good job but lost it. The trial court's exchange with defense counsel on this issue was as follows:

> THE COURT: Well, I can't see, [trial counsel], where, I've never known what lawyers are offering as indigency when you've got a mother that goes out and spends over twelve thousand dollars ($12,000.00) trying to help her son including the use of her home place for a bond. I assume the bond would stand, I assume the home place would go down the drain if he didn't show up. But then you've got the youth himself who['s] making a (inaudible) and had a position at CYC, a good one which, I assume, paid pretty good money but he got fired from. I've never known exactly how that translates into indigency when he's got a source to help him, and has, and she's probably gone broke doing so and now she comes forth saying she doesn't have any more money and he doesn't have any or any capacity to get any and he's indigent now. How is that indigency, [trial counsel]?

> [TRIAL COUNSEL]: Well, Your Honor, if the State determines that he has funds, property that he could, that he could use, that he could sell, vehicles, that he is eligible for employment, that . . .

> THE COURT: He had a car which his mother says was worth approximately thirteen hundred dollars ($1300.00) and he totaled it. He did that on his own. He got him a pretty good job out here, or which could have turned into one, and he lost it. That was his fault and I just can't justify making the taxpayers pay for your doctor bill.

Tennessee Code Annotated section 40-14-201 defines an "indigent person," for the purposes of determining whether counsel should be appointed, as one "who does not possess sufficient means to pay reasonable compensation for the services of a competent attorney[.]" Tenn. Code Ann. § 40-14-201(1) (1997). Tennessee Code Annotated section 40-14-202(c) lists factors a trial court should consider when determining the indigency of an accused, which include the nature of the services to be rendered, the usual and customary charges of an attorney in the community, the income level of the accused regardless of source, and the accused's ownership or equity in real or personal property. Tenn. Code Ann. § 40-14-202(c)(1)-(3), (5) (Supp. 2001). These factors focus on a defendant's current financial resources; the ability of an adult defendant's parents to pay for counsel or to post bond for a defendant is irrelevant to a determination of a defendant's indigency. See State v. Henry,

733 S.W.2d 127, 128 (Tenn. Crim. App. 1987); State v. Gardner, 626 S.W.2d 721, 724 (Tenn. Crim. App. 1981). Thus, the trial court erred in denying the defendant's request to be declared indigent based on the fact that his mother expended funds on his behalf, or that he had once owned a vehicle or had a job from which he had been fired.

An indigent defendant, however, is not automatically entitled to funds to pay for an expert witness. Whether due process requires that an indigent defendant be granted the assistance of an expert witness depends upon whether the defendant is able to show "the necessity of expert assistance upon an issue likely to be significant at trial." State v. Williams, 929 S.W.2d 385, 390 (Tenn. Crim. App. 1996) (citing State v. Edwards, 868 S.W.2d 682, 697 (Tenn. Crim. App. 1993)); see also State v. Barnett, 909 S.W.2d 423, 431(Tenn. 1995) (requiring that indigent defendant, to be entitled the assistance of a State-funded psychiatric expert, first make a threshold showing of particularized need for assistance of expert, *i.e.*, "that a psychiatric expert is necessary to protect his right to a fair trial").

The defendant argues that "the substantive issues of whether [he] really needed expert assistance or whether expert assistance was or was not admissible [were] never reached because the court erred in not granting [him] indigence status[.]" We conclude, however, that a full hearing would not have altered the outcome of this issue. The defendant relies on the civil definition of duress, used in the context of avoiding a contract, to argue that his subjective mental state was relevant to whether he was under duress at the time he committed the aggravated robbery. However, duress as a defense to a crime is a different matter, which is specifically defined by our legislature as follows:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Tenn. Code Ann. § 39-11-504 (1997). In State v. West, 767 S.W.2d 387, 400 (Tenn. 1989), our supreme court held that a defendant was not constitutionally entitled to the appointment of a psychiatric expert to assist in his duress defense to rape, concluding that whether he had acted "under threat of death or injury from a deadly weapon employed by [his codefendant] was a pure fact issue

-14-

upon which no expert testimony would be admissible." In this case, likewise, whether the defendant acted under duress was an issue for the jury to determine based solely on the facts, and not on the testimony of a psychiatrist about the defendant's subjective mental state or alleged susceptibility to influence. This issue, therefore, is without merit.

## III. Sentencing

As his final issue, the defendant challenges the trial court's sentencing determinations, arguing that the court improperly applied enhancement factors and failed to apply applicable mitigating factors in enhancing his sentences from the minimum in the range.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Thus,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

As a Range I offender convicted of a Class B and a Class D felony, the defendant was subject to sentences ranging from eight to twelve years, and from two to four years, respectively. Tenn. Code Ann. § 40-35-112(a)(2), (4) (1997). The sentence to be imposed is presumptively the minimum in the range for a Class B and Class D felony unless there are enhancement factors present.

Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of any applicable enhancement factors and then reduce the sentence as appropriate based on applicable mitigating factors. Tenn. Code Ann. § 40-35-210(d)-(e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

At the conclusion of the sentencing hearing, the trial court rejected all but one of the defendant's proposed mitigating factors, the defendant assisted authorities in locating or recovering property or persons involved in the crimes, see Tenn. Code Ann. § 40-35-113(10) (1997), but assigned it only minimal weight. In enhancing the sentences from their presumptive minimum, the trial court apparently accepted both enhancement factors submitted by the State, the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range, and that the defendant was a leader in the commission of the offenses. See Tenn. Code Ann. § 40-35-114(1), (2) (1997).[4] However, although the trial court considered and stated its findings on the record for each of the eleven mitigating factors proposed by the defendant, it did not clearly articulate the enhancement factors it found applicable or the weight to which it was assigning each. Consequently, our review of this issue must be *de novo*, with no presumption of correctness given to the trial court's sentencing determinations.

While we believe that it is not clear from the record which enhancement factors the trial court applied, the weight it assigned them, or the facts upon which it relied for their application, as we have stated, the State asserts in its brief that the trial court found both of its proposed enhancement factors applicable and that the record supports its findings. The defendant, on the other hand, contends that the trial court did not accept that he was a leader in the commission of the offenses, and applied enhancement factor (1) only to his aggravated robbery conviction, based on his prior theft of the Geo Tracker. The defendant then argues it was "manifestly unfair" for the trial court to use the automobile theft to enhance his aggravated robbery sentence after allowing the State to consolidate the offenses under the theory that they were part of a common scheme or plan.

Based on our *de novo* review, we conclude that enhancement factor (1) was applicable to both of the defendant's offenses, but entitled to only slight weight with respect to the theft conviction and moderate weight with respect to the aggravated robbery conviction. Enhancement factor (1) may appropriately be applied based on a defendant's previous criminal behavior that failed to result in a conviction, provided such behavior is shown by a preponderance of the evidence. See State v. Winfield, 23 S.W.3d 279, 280 (Tenn. 2000); State v. Carico, 968 S.W.2d 280, 287-88 (Tenn. 1998). Here, the defendant acknowledged having been arrested for assaulting his mother, but said the charge had been dismissed. He apparently did not report the circumstances surrounding the alleged assault,

---

[4]The sentencing hearing in this matter occurred before the effective date of the amendment to Tennessee Code Annotated section 40-35-114, which added a new enhancement factor as number one and renumbered accordingly the existing factors. In this opinion, we have utilized the numbering in effect prior to the amendment, as did the trial court.

and the probation officer who prepared his presentence report was unable to uncover a record of the arrest. "A trial court should not use evidence merely showing arrests, without more, to enhance a sentence." State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993) (citation omitted). Thus, we conclude that enhancement factor (1) should not have been applied based on the defendant's prior arrest for the assault of his mother.

The defendant's admission of having used illegal drugs, however, supports the application of this factor for both offenses. Further, we find nothing to prevent the defendant's September theft of the automobile from being considered as prior criminal behavior for the purposes of applying enhancement factor (1) to his aggravated robbery conviction. In a recent case, we rejected a defendant's argument that the trial court's denial of his motion for severance, by which he argued "'the trial court adopted the State's theory that these crimes were all part of the same transaction'" precluded the trial court from imposing consecutive sentences for each offense. State v Mario Antoine Leggs, No. M2002-01022-CCA-R3-CD, 2003 WL 21189783, at *11 (Tenn. Crim. App. May 21, 2003). In reaching this conclusion, we noted that the trial court's decision regarding the granting of a severance is governed by Tennessee Rule of Criminal Procedure 14(b)(1), whereas its decision to impose consecutive sentencing is governed by Tennessee Code Annotated section 40-35-115(b), which lists factors that "are independent from the mandates of Rule 14(b)(1)." Id. We similarly conclude in this case that nothing in the statute governing the application of enhancement factors prevents us from considering the defendant's conviction for the September 1999 theft of the automobile, as well as his admission that he vandalized the vehicle, as prior criminal behavior to enhance his aggravated robbery sentence.

Although we have previously concluded that a subsequent count in a multi-count indictment could not be enhanced based on earlier counts in the indictment in which the criminal activity occurred only eighteen days prior, we also noted that we did not intend our ruling "to preclude the possible use for enhancement purposes of prior counts in a multi-count indictment when the span of time covered is considerably longer than that found here." State v. Carol Brown, No. 01C01-9108-CC-00240, 1993 WL 17479, at *3 n.1 (Tenn. Crim. App. Jan. 28, 1993), perm. to appeal denied (Tenn. June 7, 1993). In our view, the greater than four-month interval that elapsed between the offenses in this case justifies using the theft as prior criminal behavior for the purpose of enhancing the robbery sentence. We therefore find enhancement factor (1) applicable to both offenses. However, because the defendant's history of prior criminal behavior is not extensive, we assign this factor only minimal weight with respect to the defendant's theft conviction.

Enhancement factor (2), the defendant was a leader in the commission of the offense, requires only that a defendant have been *a* leader, not *the* leader, of an offense. See State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). Although there was evidence that Myers directed some of the defendant's actions during the aggravated robbery, there was also proof that the victims of both offenses were singled out because of their connection with the defendant's girlfriend, and not Myers. The proof further established that the defendant played a major role in both offenses, with Angela Cravens testifying that the defendant accompanied Myers during the theft of the vehicle and participated equally in its vandalism, and Connie Cravens testifying that the defendant was the first

-17-

of the two to enter her house and that he distracted her by asking for directions, which allowed Myers to enter her home. Thus, there is some support for the application of this enhancement factor. However, because we think the issue is close, we decline to apply enhancement factor (2) to either offense.

The defendant proposed the following mitigating factors, presumably as to both offenses:

(1)     The defendant's criminal conduct neither caused nor threatened serious bodily injury;

(2)     The defendant acted under strong provocation;

(3)     Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

(4)     The defendant played a minor role in the commission of the offense;

(5)     Before detection, the defendant compensated or made a good faith attempt to compensate the victim of criminal conduct for the damage or injury the victim sustained;

(6)     The defendant, because of youth or old age, lacked substantial judgment in committing the offense;

. . . .

(8)     The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; however, the voluntary use of intoxicants does not fall within the purview of this factor;

(9)     The defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses;

(10)   The defendant assisted the authorities in locating or recovering any property or person involved in the crime;

(11)   The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; [and]

> (12) The defendant acted under duress or under the domination of another person, even though the duress or domination of another person is not sufficient to constitute a defense to the crime[.]

Tenn. Code Ann. § 40-35-113(1)-(6), (8)-(12) (1997).

The defendant argues that mitigating factor (1) applies to his offenses based on the evidence that he did not have a weapon and never threatened the victim of the aggravated robbery. Although we agree that this mitigating factor is applicable to his theft conviction, and assign it slight weight, we disagree that it applies to his aggravated robbery conviction. The defendant's failure to personally handle the knife or threaten the victim is irrelevant; he fully participated in an aggravated robbery with a codefendant who threatened the victim's life with a knife. Under these circumstances, mitigating factor (1) is not applicable to the aggravated robbery conviction.

As support for the applicability of mitigating factors (2), (3), (4), (6), (8), (11), and (12), the defendant points to the testimony regarding his mental limitations and history of psychiatric and psychological problems, arguing, in effect, that his psychiatric problems render him less culpable for the crimes. We respectfully disagree and decline to apply any of these mitigating factors.

The defendant argued at the sentencing hearing that mitigating factors (5), (9), and (10) applied based on evidence that he paid Connie Cravens four dollars for a replacement telephone cord, assisted authorities in locating some of her property, and informed the police of the whereabouts of Myers. The trial court found no basis for applying mitigating factor (5) based on the few dollars the defendant may have paid for the telephone cord, and noted that the evidence of how the defendant assisted the authorities in locating and arresting Myers was unclear. The trial court did, however, give some slight weight in mitigation to the defendant's role in revealing the location of some of the victim's property. We agree with the trial court's findings with respect to these mitigating factors and, like the trial court, assign only minimal weight to the defendant's role in helping to recover property. Connie Cravens' testimony was that the defendant's information led to the recovery of some fishing poles and tackle that had been in their Geo Tracker, but, in spite of the defendant's having recorded the serial numbers, their computer and monitor were never recovered. Thus, it appears that the defendant's assistance did not lead to any substantial recovery of property.

In summary, we conclude that enhancement factor (1) applies to both the defendant's offenses, but carries only minimal weight with respect to the theft conviction. We further conclude that mitigating factor (1) applies to the theft and that mitigating factor (10) applies to both offenses. However, we decline to give either mitigating factor much weight. Because the applicable enhancement factors outweigh the mitigating factors in the aggravated robbery conviction, we find no error in the enhanced sentence imposed by the trial court for that offense. However, we find that the trial court erred in enhancing the defendant's theft sentence from the presumptive two-year minimum to three years. Accordingly, we affirm the defendant's nine-year sentence for aggravated

robbery and modify his sentence for theft over $1000 from three years to two years, to be served concurrently to his nine-year sentence for aggravated robbery.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court in all respects, except for the sentence for theft, which we modify to two years, to be served concurrently to the nine-year sentence for aggravated robbery.

_____
ALAN E. GLENN, JUDGE